# UNITED STATES DISTRICT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

    -v-

WILLIAM PEPE,

        Defendant.

Case No. 1:21-cr-000052 (TJK)

## MEMORANDUM IN SUPPORT OF
## <u>DEFENDANT WILLIAM PEPE'S  MOTION TO TRANSFER</u>

Dated: May 11, 2021

Respectfully Submitted,

**PIERCE BAINBRIDGE P.C.**

John M. Pierce
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071
(213) 262-9333
jpierce@piercebainbridge.com

Robert L. Jenkins Jr.
Brynum & Jenkins
1010 Cameron Street, Ste. 123
Alexandria, Va 22314
Tel: (703) 309-0899
rjenkins@bynumandjenkinslaw.com

*Attorneys for Defendant William Pepe*

## TABLE OF CONTENTS

I.   FACTS ................................................................................................................. 1

II.   LEGAL STANDARD ........................................................................................ 3

III.   ARGUMENT ...................................................................................................... 5

          1.   *Skilling* Factor 1: The Size and Characteristics of the Community ........... 5

          2.   *Skilling* Factor 2: Nature and Extent of the Pretrial Publicity ................... 6

          3.   *Skilling* Factor 3: Proximity Between Publicity and the Trial ................... 9

          4.   *Skilling* Factor 4: Evidence of Juror Partiality ........................................... 9

     A.   Voir Dire Is Ineffective In Cases of Emotional Pretrial Publicity ........................ 16

     B.   Alternative Venue: Eastern District of New York ................................................. 18

IV.   CONCLUSION ................................................................................................... 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Estes v. State of Texas,*
        381 U.S. 532 (1965)...................................................................................................3

*Gentile v. State Bar of Nev.,*
        501 U.S. 1030 (1991)................................................................................................6

*Irvin v. Dowd,*
        366 U. S. 717 (1961)............................................................................................3, 16

*Mu'Min v. Virginia,*
        500 U.S. 415 (1991)..................................................................................................6

*In re Murchison,*
        349 U.S. 133 (1955)..................................................................................................3

*Nebraska Press Assn. v. Stuart,*
        427 U.S. 539 (1976)..................................................................................................4

*Patton v. Yount,*
        467 U.S. 1025 (1984).........................................................................................3, 4, 17

*Rideau v. Louisiana,*
        373 U.S. 723 (1963)..................................................................................................3

*Sheppard v. Maxwell,*
        384 U.S. 333 (1966)..................................................................................................3

*Skilling v. United States,*
        561 U.S. 358, 130 S.Ct. 2896 (2010) ................................................................. *passim*

*United States v. Awadallah,*
         457 F. Supp. 2d 246 (S.D.N.Y. 2006)....................................................................4

*United States v. Burr,*
        25 F. Cas. 49 (CC Va. 1807)....................................................................................3

*United States v. Casellas-Toro,*
        807 F.3d 380 (1st Cir. 2015)....................................................................................6

*United States v. Childress,*
        58 F.3d 693 (D.C. Cir. 1995)...................................................................................16

*United States v. Edmond,*
    52 F.3d 1080 (D.C. Cir. 1995) ........................................................................5, 16

*United States v. Haldeman,*
    559 F.2d 31 (D.C. Cir. 1976) ................................................................................16

*United States v. McVeigh,*
    918 F. Supp. 1467 (W.D. Okla. 1996) ....................................................................4

*United States v. (Monte) Brown,*
    374 F.3d 1326 (D.C. Cir. 2004) ............................................................................13

*United States v. Prandy-Binett,*
    995 F.2d 1069 (D.C. Cir. 1993) ............................................................................13

*United States v. Prandy-Binett II,*
    5 F.3d 558 (D.C. Cir. 1993) ............................................................................13, 15

## Statutes

18 U.S.C. § 231 ...........................................................................................................1

18 U.S.C. § 371 ...........................................................................................................1

18 U.S.C. § 1361 .........................................................................................................1

18 U.S.C. § 1512 .........................................................................................................1

18 U.S.C. § 1752 .........................................................................................................1

## Federal Rules

Fed. R. Crim. P.  21 ............................................................................................ *passim*

## Other Authorities

*Are Liberals Really More Egalitarian*, Psychology Today (2021) .............................13

*Consumer Welfare*, 52 Marketers & Public Policy, J. Public Policy & Marketing
    (2021) ...................................................................................................................11

*District of Columbia*, Urban Institute (2021) .............................................................5

Election results: The 2020 presidential race, Politico.com (2021) ...............................6

Erin Cooley et al., *Complex intersections of race and class: Among social
    liberals, learning about White privilege reduces sympathy, increases blame,
    and decreases external attributions for White people struggling with poverty*,
    148 J. Experimental Psychology: General 2218-28  (2019) ...................................12

*House Republicans demand explanation from Pelosi on extended deployment of National Guard in D.C.*, Fox 39 News (2021) ........................................................................7

Jason Johnson on NAACP's insurrection lawsuit: "*If I can bankrupt a racist, I can deal with that for now if I can't 55 jail a racist*", MSNBC.com (2021) ..........................11

Kerr, N L, et al. "*On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An 64 Empirical Study.*" Am. University Law Review, vol. 40, no. 2, 1991, pp. 665–701 ..............................................................17

Marshall Cohen, *Charges filed against Proud Boys member who allegedly pepper-sprayed police during Capitol insurrection*, CNN ......................................................9

*Pelosi Statement on Impeachment Trial of Donald Trump, Speaker Nancy Pelosi* (2021)........................................................................................................................11

Peter H. Ditto et al., *At Least Bias Is Bipartisan: A Meta-Analytic Comparison of Partisan Bias in Liberals and Conservatives*, 14 Perspectives on Psychological Sci. 273-91 (2018) ..............................................................................12

*Residents Resistant To Permanent Capitol Security Fence*, NPR (2021) ......................................8

*Siege on Democracy*, FOX 5 DC (2021) ..................................................................................10

*What It's Like To Live Inside D.C.'s Militarized Security Zone*, NPR (2021) ................................8

Winegard, Bo and Clark, Cory and Hasty, Connor R. and Baumeister, Roy, *Equalitarianism: A Source of Liberal 60 Bias* (2018) ......................................................12, 13

iv

Defendant Mr. Pepe, by and through counsel, pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure, requests a change of venue due to significant prejudice in the District of Columbia prohibitive of a fair and impartial trial, invoking his right to a fair trial by an impartial jury under the Fifth and Sixth Amendments. Mr. Pepe asserts that detrimental pretrial publicity and community prejudice in Washington D.C. is so likely to have affected the jury pool that the venire must be presumed as tainted. Mr. Pepe proposes that this matter be moved to the U.S. Eastern District of New York, where he resides, and where witnesses for the Defense reside.

## I.    FACTS

1.    Mr. Pepe was arrested in the Southern District of New York after an arrest warrant was issued in Washington, D.C., for his alleged conduct at the Capitol on January 6, 2021.

2.    The evidence in this case is centered around the January 6 Capitol incident, the 2020 Presidential election, discussions of politics, and Mr. Pepe's support for Donald Trump. The majority of the Government's evidence against Mr. Pepe is his discussion of politics. This case is factually political.

3.    During national news coverage of the Capitol events, video footage which appeared to be captured on mobile devices of persons present on the scene allegedly depicts evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

4.    The indictment alleges Mr. Pepe violated 18 U.S.C. § 371 Conspiracy; 18 U.S.C. § 231(a)(3); Civil Disorder; 18 U.S.C. § 1361 destruction of Government property or contracts, 18 U.S.C. § 1512(c)(2); Obstruction of an Official Proceeding; and 18 U.S.C. §§ 1752 (a)(1), (2), & (4) Entering or remaining in a restricted building or ground.

5.    The District Court for the District of Columbia draws its jury pool solely from the residents of the District of Columbia. In the 2020 Presidential Election, 94.6% of District of Columbia voters voted against Donald Trump.

6.    In the 2016 Presidential Election, 95.9% of District of Columbia voters voted against Donald Trump.

7.    The Democrat candidate received more than 90% of the vote in both of these elections.

8.    About 33% of employed Washington D.C. residents work for the government.

9.    Surveys and studies show the United States of America has become increasingly politically divided and polarized in recent years.

10.    Democrats specifically have been exposed to heightened levels of media attention focusing on the Capitol incident at issue in this case.

11.    President Biden and other prominent Washington D.C. Democratic politicians have decried protestors present during the Capitol incident as "white-supremacists," "domestic terrorists," and dubbed the event an "insurrection."

12.    Lawmakers and the media have given the Capitol Incident overwhelming coverage casting negative light on all those involved included Mr. Pepe.

13.    The National Guard has militarized Washington D.C. with an estimated 26,000 troops deployed in response to the January 6 incident.

14.    As a result of the Capitol incident, the Mayor of D.C. declared a public emergency.

15.    The National Guard remained in the city with 5,000 troops in March.

16.     The National Guard is expected to occupy D.C. through the Fall.

## II.     LEGAL STANDARD

The Firth Amendment and the Sixth Amendment entitle criminal defendants to a fair trial by an impartial jury. "The great value of the trial by jury certainly consists in its fairness and impartiality." *United States v. Burr*, 25 F. Cas. 49, 51 (CC Va. 1807). An impartial jury is required under the Constitution and has been required since the times of common law. *Id; see also Patton v. Yount*, 467 U.S. 1025 (1984). "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Federal Rule of Criminal Procedure 21(a) instructs that district courts "must transfer the proceeding . . . if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

While the Sixth Amendment provides a right to trial by "jury of the State and district wherein the crime shall have been committed," the Constitution's place-of-trial prescriptions do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial. *Skilling v. United States*, 561 U.S. 358, 130 S.Ct. 2896 (2010); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences.")

The Supreme Court has overturned convictions where the district court failed to transfer for venue after prejudicial pretrial publicity. *See, e.g., Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. State of Texas*, 381 U.S. 532 (1965); *Sheppard v. Maxwell*, 384 U.S. 333 (1966). The Supreme Court has also reversed convictions where there was a "huge . . . wave of public passion" and where the venire possessed "a belief in [defendant's] guilt." *Irvin v. Dowd*, 366 U. S. 717, 728

(1961) (vacating a conviction and death sentence for the trial court's failure to transfer venue for community publicity); *see also Patton v. Yount*, 467 U.S. 1025 (1984).

Later, in *Nebraska Press Assn. v. Stuart*, 427 U.S. 539 (1976), and then again in *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court clarified that "pretrial publicity—even pervasive, adverse publicity— does not inevitably lead to an unfair trial." *See Neb. Press Ass'n v. Stuart*, 427 U.S. at 554. Instead, a combination of factors needed to be considered in determining the appropriateness of change of venue. *See Skilling v. United States*, 561 U.S. 358 (2010). In *Skilling*, the Supreme Court explained that cases previously reversed on appeal for failure to change venue had trials that were tainted by an atmosphere "utterly corrupted by press coverage." 561 U.S. at 380. *Skilling* explained that the court must have proof of "vivid, unforgettable information . . . particularly likely to produce prejudice" in determining that a fair trial is untenable. *Id*.

Over the past few decades, we have seen federal courts interpret the Supreme Court's venue case law as requiring a show of community effect, in addition to a show of pretrial publicity. For example, in *United States v. McVeigh*, an Oklahoma district court ruled that the "emotional burden of the explosion and its consequences" and the community prejudice against the defendants accused of the bombing in Oklahoma City was so great that they could not obtain a fair and impartial trial in the state of Oklahoma. 918 F. Supp. 1467 (W.D. Okla. 1996). A decade later, in *United States v. Awadallah*, a New York district court stressed that "the effects that a massive, disastrous event has wrought on the jury pool as a whole" are more relevant to a change of venue request than pretrial media publicly. 457 F. Supp. 2d 246 (S.D.N.Y. 2006).

After *Skilling*, district courts began analyzing the four factors that the Supreme Court evaluated in determining whether a change of venue is warranted: (i) the size and characteristics

of the community; (ii) the nature and extent of the pretrial publicity; (iii) the proximity between publicity and the trial; and (iv) evidence of juror partiality. *Skilling* 130 S.Ct. at 2915-17. The *Skilling* standard and analysis applies to the matter at hand. [1]

## III.    ARGUMENT

A trial in Washington D.C. for Mr. Pepe would be by jurors who voted almost unanimously against Donald Trump, who have been barraged with propaganda about a "white nationalist" attack, who are continuously told they were victims of an "insurrection," who were placed under curfew and locked down as a result, and who have been placed under seemingly endless military hold because of danger posed by "Domestic Violent Extremists." The unavoidable community prejudice, and particularized prejudice against Mr. Pepe, render the venire so greatly prejudiced against him that Mr. Pepe cannot obtain a fair and impartial trial in Washington D.C. Review of the *Skilling* factors weighs Mr. Pepe's case in favor of transfer.

### 1.    *Skilling* Factor 1: The Size and Characteristics of the Community

Washington D.C. is both a small and highly insular political community rendering it unable to produce an impartial jury in Mr. Pepe's case. Washington D.C. is a relatively small community, with a population of about 700,000, and an estimated potential jury pool of less than 500,000. About 33% of employed Washington D.C. residents work for the government, considerably reducing the eligible jury pool for a case where government employment will likely cause a bias.[2] Moreover, approximately 95% of the voters in D.C. voted against Donald Trump, rendering

---

[1] Prior to *Skilling*, the District Court for the District of Columbia employed its own standard for transfer of venue, 36 an "extreme circumstances" standard. *See United States v. Edmond*, 52 F.3d 1080, 1099 (D.C. Cir. 1995). Skilling now directs us to analyze four components in examining the presumption of prejudice, instead of the "extreme circumstances" standard.

[2] *District of Columbia*, Urban Institute (2021), https://www.urban.org/policy-centers/cross-center-initiatives/state- 37 and-local-finance-initiative/projects/state-fiscal-briefs/washington-dc (last visited Mar. 22, 2021).

Washington D.C. as having the least diverse political population as compared to each of the fifty states.[3]

Further, since the Capitol incident polarization and bias against supporters of Donald Trump has exploded further foreclosing the possibility of empaneling a neutral jury. The D.C. jury pool, already politically averse to Donald Trump supporters, has been barraged with political propaganda from U.S. politicians and coverage of the same by the media following the January 6 incident. According to a Pew Research Center poll, Democrats were significantly more likely to hear about the Capitol incident than Republicans.

Washington D.C. provides a small, uniform pool of people when compared to Houston in the *Skilling* case, which had a "large, diverse pool" of 4.5 million eligible jurors. *Skilling* 561 U.S. at 382. Indeed, Washington D.C. is more similar to the community in Rideau, a small town of 150,000 residents; or even Puerto Rico, which has "a compact, insular community" of approximately 3 million people. *Skilling*, 130 S.Ct. at 2915; *United States v. Casellas-Toro*, 807 F.3d 380, 385 (1st Cir. 2015); *see also Mu'Min v. Virginia*, 500 U.S. 415 (1991) (potential for prejudice mitigated by the size of the Eastern District of Virginia, "which has a population of over 3 million"); *but see Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991) (reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals).

2.    *Skilling* **Factor 2: Nature and Extent of the Pretrial Publicity**

The pretrial notoriety of the Capitol incident is more complicated, publicized and widespread than any other criminal matter in Washington D.C.'s history. Aside from media publicity, there is extensive political publicity for the Capitol cases. It appears that every local D.C.

---

[3] Election results: The 2020 presidential race, Politico.com (2021),
https://www.politico.com/2020-election/results/ 38 president/ (last visited Mar. 22, 2021).

politician, and every national politician working in D.C., has chimed in on this case. More fuel was added to the fire as Democrats, the party that mirrors the beliefs of 95% of the D.C. jury pool, started referring to the individuals involved in the Capitol incident as "white supremacists" and "insurrectionists" — during a time of exceptional political divide in the United States.

President Biden made a recent speech on racial tensions in the U.S. in which he referred to the Capitol arrestees as "a group of thugs, insurrectionists, political extremists, and white supremacists." The Biden administration warned that these people were "ideologically-motivated violent extremists with objections to the exercise of governmental authority and the presidential transition, as well as other perceived grievances fueled by false narratives." (Notably, not a single one of the more than 300 arrested Capitol defendants have been charged with terrorism, hate crimes, or insurrection — contrary to what the Biden administration warnings would imply.) Biden's administration also warned that others like these arrestees "could continue to mobilize to incite or commit violence," and Nancy Pelosi continues to keep National Guard in Washington D.C. to continue manifesting a physical reminder of the perceived danger. [4]   This rhetoric combined with the already small and politically homogenous community Washington D.C. presents raises grave concerns about the ability to empanel a fair jury in the venire.

Further, at least 26,000 National Guard troops took over Washington, D.C. in the wake of the Capitol incident. The streets were empty throughout January; D.C. was a militarily occupied zone, and military presence continues to this day. Military fencing with barbed wire and street blockades remain in Washington D.C. to this day, standing as a visual reminder to residents that those involved in the Capitol incident have impaired every juror's freedom in the district. This is

---

[4] *House Republicans demand explanation from Pelosi on extended deployment of National Guard in D.C.*, Fox 39 News (2021), https://www.foxnews.com/us/national-guard-troops-dc-fall-pelosi-mcclain (last visited Mar. 22, 2021).

an unprecedented showing of force in response to the Capitol incident that impacts the entire D.C. community.

Washington D.C. residents were impacted emotionally, visually, and physically by the military restrictions. Washington D.C. resident Andrew Kovacs told NPR, "It feels like Gotham City from the Batman movies where we are kind of on our own, locked in the city here. You know, with the bridges closing out of Virginia, it feels like it's just us, and the whole world is watching."[5] Brandon Stryder explained the practical struggles of living inside of a military enclosure, saying, "There's a checkpoint actually set up right by our building. A few nights ago, we were trying to pull our car out to go get groceries and they put a cinder block, blocking the alleyway so we couldn't even exit the parking garage." [6] D.C. resident Yolanda Inchauregui told NPR, "I feel like I'm in a war." [7] Moreover, D.C. residents feel that they are being punished for the wrongdoing of the "mob attack on the Capitol," with one D.C. resident expressing that, "a fence punishes the wrong people." [8] This sentiment that someone needs to be punished for impacting the D.C. community is further evidence that this insular community cannot fairly serve as an unbiased venire in this case.

Washington D.C. residents, who were already predisposed to political bias against the Capitol defendants, had their bias cemented by the burden of enduring a militant response to the January 6 incident. Furthermore, the tensions in the city are suggestive of the residents'

---

[5] *What It's Like To Live Inside D.C.'s Militarized Security Zone*, NPR (2021), https://www.npr.org/local/ 40 305/2021/01/19/958311657/what-it-s-like-to-live-inside-d-c-s-militarized-security-zone (last visited Mar. 22, 2021).
[6] *Id.*
[7] *Id.*
[8] *Residents Resistant To Permanent Capitol Security Fence*, NPR (2021), https://www.npr.org/ 43 2021/02/13/967704469/residents-resistant-to-permanent-capitol-security-fence (last visited Mar. 22, 2021).

predisposition to "punish" Capitol incident defendants. The closure of the nation's capital by the National Guard was not just a physical manifestation of the city's greatest fears and insecurities, it also serves as a daily reminder to D.C. residents that they are continuing to pay for the Capitol incident with loss of their beautiful city and loss of their travel freedoms.

Between the media's concentration on Mr. Pepe, the political response to the Capitol incident, and the relentless media coverage of political statements made about the Capitol defendants, this case is rendered into the type of exceptional circumstance that warrants a transfer of venue, as the presumption of prejudice is unavoidable.

### 3. *Skilling* Factor 3: Proximity Between Publicity and the Trial

While a trial date has not yet been scheduled for Mr. Pepe, the defense anticipates continued media coverage and involvement in the case, and D.C. is expected to have continued National Guard presence through the Fall. Mr. Pepe expected to be tried once jury trials reconvene, presumably sometime after April 2021. *See* Standing Order 20-93. In contrast, Skilling went to trial four years after the highly publicized origination of the case. *Skilling*, 130 S.Ct. at 2902. Tensions remain high and the media's attention on these Capitol incident cases has not relented, as seen by the slew of news stories covering the pretrial proceedings of the defendants to this day.[9]

### 4. *Skilling* Factor 4: Evidence of Juror Partiality

*Skilling* emphasized "the kind of vivid, unforgettable information the Court has recognized as particularly likely to produce prejudice," when considering the factor of jury partiality. *Skilling*, 561 U.S. at 383. The Capitol incident was in itself, vivid and unforgettable. Of course, the media's

---

[9] Marshall Cohen, *Charges filed against Proud Boys member who allegedly pepper-sprayed police during Capitol insurrection*, CNN, https://www.cnn.com/2021/03/13/politics/christopher-worrell-proud-boys-charges-capitol-insurrection/index.html.

constant replay of the imagery has made sure that no one can forget it. [10] But the imagery for D.C. residents did not stop at the Capitol. The closure of Washington D.C. throughout January, the physical appearance of Washington D.C. as a military state for months after the Capitol incident, the restrictions on D.C. residents' movement, the nonstop media discussion about the incident, the nonstop political attacks on the individuals involved with the incident as "insurrectionists," the firing of individuals associated with the incident — combine together to form the type of vivid, unforgettable information that inarguably leads us to presume bias for the entire venire. The continuing presence of the National Guard, and the remaining military fencing and restrictions, serve as a daily reminder to Washington D.C. residents of the Capitol incident. Washington D.C. residents remain actively affected by the Capitol incident and the participants, as the cases against the Capitol incident participants proceed through the justice system.

Moreover, the fact that approximately 95% of the voters in D.C. voted against Donald Trump, yet the facts of this case require the jury to be entirely open-minded to a political case that prominently features Donald Trump, during a time of exceptional political divide in this country, weighs heavily on juror partiality. Juror bias against Mr. Pepe cuts deeper, still. President Biden denounced Trump supporters as "thugs, insurrectionists, political extremists, and white supremacists." Mr. Pepe is being scapegoated for our societal race problems and being used by Democrat commentators as an example of someone who should be socially reprimanded.

Those who control the political narrative are sending a message to all prospective jurors that anything but a guilty verdict will be unacceptable. Nancy Pelosi has made it clear that voting

---

[10] Even two months after the incident, FOX 5 DC is featuring a five-part podcast segment called, "Siege On 50 Democracy" about the Capitol incident. *See Siege on Democracy*, FOX 5 DC (2021), https://www.fox5dc.com/tag/ series/siege-on-democracy-podcast (last visited Mar. 22, 2021).

in favor of conviction of "insurrection" is "courage," while voting against conviction is "pathetic."[11]

According to a 2021 research paper by scientists from six U.S. universities, political positions are influencing Americans' decisions to the point of irrationality. [12] "For example, research has found that employees accept lower wages to work for politically like-minded entities," amongst other unsound decisions driven primarily by politics. [13] Political polarization "ultimately deprives individuals of intellectual diversity, among other things," the researchers concluded. [14] This research leads to the inevitable conclusion that the insular politics of Washington D.C. are a significant risk to a fair trial by an impartial jury in a case that is entirely political, with a defendant who was marred by the media as a polarizing political figure.

Indeed, these ideas of political justice in the Capitol cases are already circulating in mainstream media. On February 16, 2021, MSNBC's Dr. Jason Johnson stated on national television, in response to the Capitol incident, "If I can bankrupt a racist, I can deal with that for now *if I can't jail a racist*." [15] (Emphasis added). He then repeated this idea on Twitter, as did MSNBC. [16] Due to the heightened political awareness in Washington D.C., as the political capital

---

[11] *See Pelosi Statement on Impeachment Trial of Donald Trump, Speaker Nancy Pelosi* (2021), https:// 51 www.speaker.gov/newsroom/21321 (last visited Mar. 22, 2021).

[12] T.J. Weber, et al., *EXPRESS: Political Polarization: Challenges, Opportunities, and Hope for Consumer Welfare*, 52 Marketers & Public Policy, J. Public Policy & Marketing (2021), https://doi.org/ 10.1177/0743915621991103.

[13] *Id.*

[14] *Id*

[15] Jason Johnson on NAACP's insurrection lawsuit: "*If I can bankrupt a racist, I can deal with that for now if I can't 55 jail a racist*", MSNBC.com (2021), https://www.msnbc.com/deadline-white-house/watch/jason-johnson-on-naacp-sinsurrection-lawsuit-if-i-can-bankrupt-a-racist-i-can-deal-with-that-for-now-if-i-can-t-jail-a-racist-101117509813 (last visited Mar. 22, 2021).

[16] "Given the weaknesses in our criminal justice system . . . as far as I'm concerned, if I can bankrupt a racist, I can 56 deal with that for now if I can't jail a racist. And I think that a lot of people are gonna end up being bankrupt"- @DrJasonJohnson w/ @NicolleDWallace", Deadline White House @DeadlineWH (Feb. 16, 2021)

of our country, and based on the findings of the 2021 Political Polarization research, D.C. jurors would be statistically more likely to skew their verdict in favor of the more politically favorable verdict — a guilty verdict — to suit their tribal-politic goals. Indeed, jurors would feel shame to even raise the possibility of a not guilty verdict in the Washington D.C. community of jurors.

"Bias can infect the cognitive process from beginning to end and anywhere between," and "political commitments are very likely to give rise to bias," according to a Florida State University study on the issue of liberal bias. A 2018 study of 51 experimental studies involving over 18,000 participants examined the prevalence of political bias when it challenged political beliefs or allegiances. [17] The researchers found that people exhibited a bias in favor of their own politics, that they saw information as "more valid and compelling when it confirmed rather than challenged their political affinities." [18] This is an important consideration in a political case before a jury that will showcase political issues debated by counsel. Another study found that "Liberals were consistently biased against information that portrayed privileged groups more favorably than victims' groups." [19] Indeed, as mentioned supra, scientists have already proven that an assessment of an individual as possessing "white privilege" leads liberals to asses "negative social evaluations" of that individual. [20]

---

https://www.twitter.com/DeadlineWH/status/1361825129483952133 (last visited Mar. 22, 2021).

[17] Peter H. Ditto et al., *At Least Bias Is Bipartisan: A Meta-Analytic Comparison of Partisan Bias in Liberals and Conservatives*, 14 Perspectives on Psychological Sci. 273-91 (2018).
[18] *Id.*
[19] Winegard, Bo and Clark, Cory and Hasty, Connor R. and Baumeister, Roy, Equalitarianism: A Source of Liberal 60 Bias (2018), https://ssrn.com/abstract=3175680.
[20] Erin Cooley et al., *Complex intersections of race and class: Among social liberals, learning about White privilege reduces sympathy, increases blame, and decreases external attributions for White people struggling with poverty*, 148 J. Experimental Psychology: General 2218-28 (2019), https://psycnet.apa.org/record/2019-22926-001.

As the *American University Law Review Study On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study* noted, "jurors awareness and willingness to report bias is imperfect." Moreover, liberals are less aware of their personal biases. [21] This matters in jury selection, where counsel and the Court rely, to a large extent, on juror self-reporting.

Under these circumstances, a fair trial for Mr. Pepe is simply improbable in light of the community prejudice and the highly politicized environment of Washington D.C. This improbability can be computed. In assessing human behavior, the United States Court of Appeals for the District of Columbia created a most fitting test: "We are concerned not simply with probabilities, but with conditional probabilities: if one event occurs, how likely is it that another event will occur?" *United States v. Prandy-Binett*, 995 F. 2d 1069, 1070 (D.C. Cir. 1993); *United States v. (Monte) Brown*, 374 F. 3d 1326, 1328 (D.C. Cir. 2004); *see also Skilling*, 130 S.Ct. at 2948 ("[A]s the tide of public enmity rises, so too does the danger that the prejudices of the community will infiltrate the jury"). The value of this analysis is to consider the effect of circumstances in the cumulative. *United States v. Prandy-Binett II*, 5 F. 3d 558, 559 (D.C. Cir. 1993). This conditional probabilities analysis is aptly pertinent to reviewing prospective jurors. Applying this inquiry, we can ask:

- Out of the eligible jury pool, if 95% of D.C. voted against Donald Trump, what portion of these prospective jurors will be able to remain impartial in a case

---

[21] *Are Liberals Really More Egalitarian*, Psychology Today (2021), https://www.psychologytoday.com/us/blog/the- 63 antisocial-psychologist/202102/are-liberals-really-more-egalitarian (last visited March 22, 2021); Winegard, Bo and Clark, Cory and Hasty, Connor R. and Baumeister, Roy, *Equalitarianism: A Source of Liberal Bias* (2018), https://ssrn.com/abstract=3175680.

involving a fact pattern of both Donald Trump and Mr. Pepe claiming that Biden lost the election and Trump won the election?

- Out of these prospective jurors, how many can remain impartial after seeing nonstop media coverage about the Capitol incident that involved Mr. Pepe?

- Out of these prospective jurors, how many can remain impartial after living through the D.C. lockdown and continuing militant patrol in response to the Capitol incident involving Mr. Pepe, without attributing blame to Mr. Pepe?

- Out of these prospective jurors, how many can remain impartial after being advised by the federal government that there is a fear of domestic terrorism and that people like Mr. Pepe, or motived by Mr. Pepe, "could continue to mobilize to incite or commit violence" near their home in Washington D.C.?

- Out of those prospective D.C. jurors, how many can remain impartial after hearing President Biden accuse Capitol arrestees like Mr. Pepe of being "insurrectionists, political extremists, and white supremacists," and other politicians parroting nearly the same?

- Out of the remaining prospective jurors, how many can remain impartial after hearing calls to conviction from the politicians and pundits who control the political ethics narrative of Washington D.C.?

- Out of these, how many can remain impartial after seeing numerous stories about Mr. Pepe's support of a "racist president"?

- Out of these prospective jurors, how many can remain impartial after seeing numerous stories about Mr. Pepe being an "insurrectionist"?

14

- Out of these prospective D.C. jurors, how many can refrain from trying to punish her for her politics, or for something she is not charged, such as "insurrection"?

- Out of those prospective D.C. jurors, how many will disobey "cancel culture" and the social pressure to punish Mr. Pepe for being politically incorrect?

- Out of these remaining prospective jurors, how many will have the confidence to raise the conversation of a not guilty verdict in deliberations with juror members who might call them "racist" for even bringing up the discussion?

- Out of these prospective jurors, how many can render a not guilty verdict even if it will mean being scrutinized by the public after such a verdict, potentially being called a "racist" or a "traitor" by their community after doing so?

- Out of these prospective jurors, how many can render a not guilty verdict in the face of a community seeking retribution for the militarization and unforgettable disruption of their city?

- Out of these prospective jurors, how many can render a not guilty verdict if that means letting Mr. Pepe walk free on these charges?

These inquiries can go on and on until we reach a point near absolute zero. But we don't have to. Rule 21(a) only requires a showing of a "great" prejudice against the defendant.

"This analysis assumes interdependence." *Prandy-Binett II*, 5 F.3d at 560. Indeed, the extraordinary militarization of Washington D.C. in response to the Capitol incident, combined with the obsessive media coverage of the incident, combined with particularized media attention on Mr. Pepe, combined with the devastating political linguistics aimed at characterizing all participants in the Capitol incident as terrorists, combined with malicious inaccuracies about

"white supremacy" being attributed to Mr. Pepe, combined with the district's incomparable political opposition to the politics that define the underlying case, and the residents' large federal government employment statistics —all yield a great prejudice in Washington D.C. against Mr. Pepe.

Mr. Pepe is entitled to a fair trial. The growing number of personal attacks on Mr. Pepe by the media and on social media, compounded by the prejudicial community impact on Washington D.C. that arose out of the city's response to the January 6 Capitol incident, have effectuated pretrial prejudice against Mr. Pepe in Washington D.C. that is so likely to have permeated the jury pool with prejudice that the venire must be presumed as tainted. This case is the embodiment of the "huge . . . wave of public passion" that was seen in *Dowd*. 366 U.S. at 728. Mr. Pepe's case meets and exceeds the standard set out in Rule 21(a) and in *Skilling*.

### A.    Voir Dire Is Ineffective In Cases of Emotional Pretrial Publicity

Rule 21(c) of the Federal Rules of Criminal Procedure states that "[a] motion to transfer may be made at or before arraignment or at any other time the court or these rules prescribe." The D.C. Circuit has historically preferred *voir dire* of potential jurors as a means of dealing with pretrial publicity, instead of deciding on transfer under Rule 21(a) as raised "at or before arraignment," under Rule 21(c). *See United States v. Haldeman*, 559 F.2d 31, 60, 63-64 (D.C. Cir. 1976).

Taking this position further, the D.C. Circuit had placed a burden on the defense that was higher than the standards of the Federal Rules of Criminal Procedure. Instead of requiring a showing of a great prejudice under Rule 21(a), the D.C. Circuit imposed a higher standard of "extreme circumstances." *See United States v. Edmond*, 52 F.3d 1080, 1099 (D.C. Cir. 1995); *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995). After *Skilling*, D.C. Circuit's

"extreme circumstances" test became insufficient and has been replaced with the four-prong analysis as outlined supra. While the Supreme Court in *Skilling* did not bar a court from deferring the decision on a change of venue motion until *voir dire*, the *Skilling* court did not abrogate Rule 21 either.

While there are cases where time and thorough *voir dire* may be sufficient to correct for pretrial publicity, emotional publicity and community publicity cannot be cured through either time or *voir dire*. Of particular importance on this are the finding from *On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study*, which found that *voir dire* challenges are insufficient and ineffective at weeding out biased jurors in cases with prejudicial pretrial publicity.[22] "The net effect of careful voir dire concerning pretrial 64 publicity, therefore, was nil, and the bias created by the publicity survived voir dire unscathed."[23] Furthermore, "emotional publicity" could not be cured, not even through time and continuances.[24] *See also Patton v. Yount*, 467 U.S. 1025, 1031 (1984) ("[A]dverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed"). Emotional publicity was defined as the kind of sensational publicity likely to arouse an emotional response.

Mr. Pepe's case is full with emotional pretrial publicity. The unprecedented community prejudice in Washington D.C., the unprecedented amount of political and media commentary on the criminal case, the staggering amount of emotion that charged the 2020 Presidential election,

---

[22] Kerr, N L, et al. "*On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An 64 Empirical Study.*" Am. University Law Review, vol. 40, no. 2, 1991, pp. 665–701, https:// www.ojp.gov/library/abstracts/effectiveness-voir-dire-criminal-cases-prejudicial-pretrial-publicity-empirical.
[23] *Id*. at 697.
[24] *Id*. at 675.

and the emotional socio-political issues at the heart of the publicity surrounding Mr. Pepe's case, render this case the type of "emotional publicity" case that infects the D.C. venire with a bias that cannot be cured. Nothing about the pretrial publicity and community prejudice in this case are similar in scope or magnitude to the publicity cases that came before the D.C. Circuit in the past. To apply the same principles of protection to this Capitol case as prior D.C. publicity cases would be constitutionally insufficient to preserve the Mr. Pepe's Fifth and Sixth Amendment rights.

Therefore, the D.C. Circuit's usual practice of deferring a motion for transfer until after *voir dire* is insufficient to protect Mr. Pepe, and may instead result in a false sense of security with a jury panel that is inherently incapable of unbiased adjudication. The only remedy to cure the prejudicial pretrial publicity and community prejudice against the defendant is to transfer this matter to an alternative venue.

### B.    Alternative Venue: Eastern District of New York

An appropriate alternative venue for this case is in the Eastern District of New York which is a much larger jurisdiction than Washington D.C. New York is also a convenient forum since Mr. Pepe resides in the Eastern District of New York. Witnesses for the Mr. Pepe's defense also reside in the Eastern District of New York.

While pretrial publicity was also prevalent in New York, it did not compare to the level of political publicity experienced in Washington D.C., nor was the community prejudiced through the closure of their streets or through continuous National Guard presence. New York residents have not been warned that domestic terrorists are threatening their hometown. New York is not an insulated and nearly totally homogenous political community. New York residents are not employed by the federal government in any statistically significant rates. And, the parties are

18

significantly more likely to find an unbiased jury panel in a community where internet access and media exposure is more limited. The parties are much more likely to find objective jurors in New York than in Washington D.C. Applying the reasoning of the United States Supreme Court, as well as the highest state appellate courts, transfer of this case is the only appropriate relief.

## IV.    CONCLUSION

Mr. Pepe has demonstrated that he faces significant prejudice in the District of Columbia, prohibitive of a fair and impartial jury trial. He rightfully has invoked his constitutional guarantee to a fair trial by an impartial jury under the Fifth and Sixth Amendments, and aptly requests a transfer of venue to the Eastern District of New York pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure. Counsel submits the decision of to which district this case should be referred to the Judge of the Court of Appeals for the District of Columbia Circuit based on where the Mr. Pepe resides.

Dated: May 11, 2021                      Respectfully Submitted,

**PIERCE BAINBRIDGE P.C.**

John M. Pierce
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071
(213) 262-9333
jpierce@piercebainbridge.com

Robert L. Jenkins Jr.
Brynum & Jenkins
1010 Cameron Street, Ste. 123
Alexandria, Va 22314
Tel: (703) 309-0899
rjenkins@bynumandjenkinslaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on May 11, 2021 that the foregoing document was filed with the Court's CM/ECF systemwhich will provide notice on all counsel deemed to have consented to electronic service. All other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing document by mail on this date.

 /s/ John M. Pierce
John M. Pierce